**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED MAY 28, 2008

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v                                                          No. 132042

KATHERINE SUE DENDEL,

Defendant-Appellee.

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

Defendant, an insulin-dependent diabetic, was convicted of second-degree murder for injecting the victim, her live-in partner, with a lethal dose of insulin. The Court of Appeals reversed her conviction and remanded for a new trial after concluding that defense counsel was ineffective for failing to produce an expert to refute the testimony of the prosecution's experts that the victim died from an insulin overdose. We reverse the judgment of the Court of Appeals and reinstate defendant's conviction. Defense counsel was not ineffective under the test of *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), because defendant did not prove that she was prejudiced by her counsel's failure

to produce an expert witness. The Court of Appeals erred in holding that defense counsel could have presented an expert witness who would have refuted the testimony of the prosecution's experts to the extent that defendant's acquittal would have been reasonably probable. Further, the trial court correctly held that, in light of the strong circumstantial evidence of defendant's guilt, it was not reasonably probable that the outcome would have been different had a defense expert testified.

## I. FACTUAL BACKGROUND

Defendant and the victim, Paul Michael Burley, were in a long-term relationship and had lived together for years. Burley had been taking numerous medications for several serious illnesses, including an infection with human immunodeficiency virus (HIV), herpes, hepatitis B and C, epilepsy, ataxia, neuropathy, chronic obstructive pulmonary disease, severely impaired vision, dementia, lymphoma, and throat cancer. Burley was not, however, diabetic. By defendant's own account, Burley was a difficult person to care for. Defendant was solely responsible for making sure that Burley took his medications and for tending to his everyday needs.

Defendant's relationship with Burley's family was strained, partly by what she perceived as the family's failure to help with Burley's care. Before Burley's death, defendant had told his sister that "if something happens to your brother, your family won't know what hit you." About one week before Burley's death, defendant, frustrated with Burley's demands, also told Burley's sister, "I can't

2

take this" and "I feel like giving him a shot of insulin." As an insulin-dependent diabetic, defendant had access to insulin and knew how to inject it. Defendant also knew how insulin metabolizes and that no trace of insulin would remain in Burley's blood after an insulin injection.

Defendant had expressed her frustration with caring for Burley to a Family Independence Agency (FIA) employee. Less than a week before Burley's death, defendant e-mailed the FIA employee to seek help with caring for Burley. Defendant told the employee that she could not manage all of Burley's demands on her own. During a subsequent telephone conversation, defendant again stated that she was frustrated and concerned that the situation was deteriorating and that she no longer knew how to manage Burley. The FIA employee suggested that defendant have Burley evaluated at a mental-health facility or have him placed in respite or hospice care.[1] The FIA employee testified that defendant had never before expressed any problems with caring for Burley.

During the week leading up to Burley's death, defendant sought help from the Department on Aging. The department representative told defendant that she did not qualify for help because both she and Burley were not 60 years old. The representative suggested that defendant instead contact hospice services.

---

[1] The FIA employee testified that as long as Burley was competent, the FIA could not compel defendant to put Burley in a nursing home.

3

Defendant replied that hospice services would not help because Burley was not yet near death.

Defendant's caregiving situation took another turn for the worse the day before he died. On March 14, 2002, a visiting nurse had been assigned to assist defendant and educate her in the proper methods of care. She visited five times, but, on the day before Burley's death, the nurse terminated her services because Burley had been uncooperative. When the nurse told defendant that she was terminating her services, defendant became "quite tearful and upset." Defendant told the nurse that she did not know how long she could continue caring for Burley.

At 3:00 a.m. on the day of Burley's death, defendant called 911, reporting that Burley had been hallucinating and running around with a butter knife. Defendant asked the police to come take Burley to a mental institution. When the police arrived, Burley was sitting calmly in a chair. He told the officers that he was fine and that there was no problem. The police decided to leave Burley at home because he was not a threat to himself or others. One officer testified that defendant was visibly upset with Burley and the police. Defendant also later admitted that she was frustrated with the officers' decision and that she was hoping for relief because she was at her "wit's end."

Defendant contended that later that day she discovered Burley slumped over on the couch and unresponsive. She testified that, because Burley was cold and covered with purple blotches, she thought he might be dead. Rather than

4

calling 911, however, she instead called a friend, who arrived and contacted 911. While the police and emergency personnel were removing Burley's body from the house, one of Burley's sisters telephoned. Defendant answered the phone, but quickly ended the conversation without telling her that Burley had died.

During the next several days, defendant spoke with several of Burley's siblings. She never informed them of his death, but instead falsely told them that he had been hospitalized. One of the victim's sisters described a 74-minute conversation with defendant two days after Burley's death. She testified that defendant was "very upbeat" and "nonchalant" in her discussion of topics ranging from Burley's health to antique jewelry. During this conversation, defendant laughed while describing an alleged incident when Burley had wandered away from the apartment complex and become lost. Yet defendant never mentioned Burley's death.

Defendant wanted Burley's body cremated without an autopsy being performed. Although an autopsy was performed despite defendant's wishes, defendant had Burley's body cremated before his family learned about his death. When a police detective incorrectly told defendant that the medical examiner had detected insulin in Burley's body, defendant called him a liar and explained that insulin could not be detected in the human body after death because it breaks down and depletes naturally.

After defendant's arrest, she told police detectives that Burley had injected himself with insulin. During a later interview with a police detective, defendant

5

said, "That poor dear, he killed himself for me." She told the detective that despite Burley's severely impaired vision and problems with holding things, he could inject himself with insulin.[2] Defendant also told defense counsel that Burley had killed himself by an insulin injection and that she wanted him to pursue this theory of defense at trial. Defendant also testified that Burley had mental problems and that he had "talked suicide for 10, 15 years." She had informed two of Burley's doctors of his suicidal intentions.

Defendant was charged with first-degree murder. The prosecution theorized at the bench trial that defendant injected the victim with a lethal dose of insulin on April 2, 2002. The prosecution presented two expert witnesses, Dr. Bernardino Pacris[3] and Dr. Michael Evans,[4] who testified that the evidence supported the theory that Burley had died from an insulin injection rather than from natural causes or an overdose of one of his medications.[5] Defense counsel Joseph Filip argued that Burley had died either by injecting himself with insulin

---

[2] Defendant also suggested the unlikely scenario that if Burley had not injected the insulin himself, perhaps someone had broken into her apartment, found her insulin and syringe, and given Burley the shot.

[3] Dr. Pacris is an Oakland County medical examiner and a former Jackson County forensic pathologist who has been qualified as an expert witness in more than 100 trials.

[4] Dr. Evans is the president and chief executive officer of AIT Laboratories, the former state toxicologist for Indiana, and a professor of toxicology who has testified as an expert in 35 states.

[5] We discuss Dr. Pacris's and Dr. Evans's trial testimony in detail in part III(A) of this opinion.

or from the side effects of numerous medications prescribed for him. Defense counsel did not present any expert testimony to rebut the testimony of the prosecution's experts.

The trial court found defendant guilty of the lesser-included offense of second-degree murder. Defendant moved for a new trial, arguing that Filip had deprived her of a fair trial by failing to conduct a reasonable investigation into the cause of Burley's death. The trial court denied the motion. The Court of Appeals remanded for a *Ginther*[6] hearing to determine whether Filip had provided ineffective assistance.

At the *Ginther* hearing, appellate defense counsel called Dr. Laurence Simson,[7] who testified that the evidence did not support the view that defendant had died from an insulin overdose. Dr. Pacris defended his trial testimony that Burley had died of hypoglycemic shock caused by insulin.[8] The trial court rejected defendant's claim of ineffective assistance of counsel. Instead, it found that defense counsel's performance had been objectively reasonable. The court concluded that defendant had not been prejudiced by Filip's failure to call an expert forensic pathologist to rebut the opinions of the prosecution's experts. The

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[7] Dr. Simson is a forensic pathology consultant and a former professor of pathology, an Ingham County pathologist, and a national consultant in forensic pathology to the Surgeon General of the United States Air Force.

[8] We discuss Dr. Simson's and Dr. Pacris's *Ginther* hearing testimony in detail in part III(A) of this opinion.

court explained why the outcome of the trial would not have been different if the defense had offered Dr. Simson's testimony:

> And if the case was just, . . . the police had a dead body and you have Dr. Pacris and Dr. Simson, that would be one thing. It wasn't that. If there was a lot of other testimony, of statements and other witnesses and other things that pointed in that direction, it would have made the testimony of Dr. Evans and Dr. Pacris not as . . . clear. But I don't know that I can say that there's a reasonable probability that the outcome would have been different. There was still—there was other evidence, . . . admittedly all circumstantial, but there was a lot of other evidence. I am not convinced that that has been established, that it's reasonably probable that the outcome would have been different . . . .

A divided Court of Appeals reversed and remanded for a new trial. The majority summarized its holding as follows:

> Defense counsel's failure to consult with and present the testimony of appropriate medical experts to address the central issue in this case, the cause of Burley's death, was clearly deficient in light of prevailing professional norms and, but for that deficiency, there is a reasonable probability that the outcome of defendant's trial would have been different. [*People v Dendel,* unpublished opinion per curiam, issued July 18, 2006 (Docket No. 247391), p 3.]

The Court of Appeals majority explained that, despite Dr. Pacris's testimony that Burley had died from insulin shock, Filip failed to consult a forensic pathologist or Burley's doctors regarding the cause of Burley's death. The majority held that Filip's failure to consult an informed expert who could have refuted Dr. Pacris's conclusions essentially amounted to a concession that Burley had died from insulin shock. Because it was unlikely that Burley administered the insulin himself, in light of his physical limitations, the trial court was left to conclude that defendant administered the insulin that caused Burley's death. The majority

8

noted that the *Ginther* hearing had demonstrated that a qualified pathologist (Dr. Simson) would have (1) refuted Dr. Pacris's conclusion that Burley died from insulin shock and (2) provided an alternative, noncriminal explanation for Burley's death. The majority concluded: "Trial counsel's failure deprived defendant of a substantial defense, and there is a reasonable probability that this would have made a difference in the outcome of the trial." *Dendel, supra* at 4.

Judge Wilder dissented, rejecting the conclusion that defendant had been prejudiced by counsel's performance. He relied on the trial court's conclusion that even if Filip had introduced Dr. Simson's testimony, the court would nonetheless have found defendant guilty in light of the weight of the evidence. This evidence supporting defendant's guilt included the following: defendant had the opportunity to inject the insulin, defendant admitted being aware that no trace of insulin would be found in Burley's blood after his death, defendant was under considerable stress in trying to care for Burley by herself, and defendant not only failed to inform Burley's family of his death, but she apparently hid it from the family. Judge Wilder also noted that nothing established that Dr. Simson was more credible than Dr. Pacris. Moreover, Dr. Simson concededly could not rule out insulin shock as the cause of death. Judge Wilder stated that the effect of expert testimony depends on the fact-finder's evaluation of credibility, and the fact-finder in this case had expressly determined that Dr. Simson's testimony would not have changed the result of the trial.

The prosecution appealed, arguing that the Court of Appeals had erred in holding that defendant was entitled to a new trial on the basis of ineffective assistance of counsel. This Court heard oral argument on whether to grant the application or take other peremptory action.

## II. STANDARD OF REVIEW

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews a trial court's factual findings for clear error and reviews de novo questions of constitutional law. *Id.*

## III. ANALYSIS

In *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001), this Court explained the test for determining whether a defendant has been denied the effective assistance of counsel:

> A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden. To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland, supra* at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial

10

strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).[9]

We conclude that defendant has failed to demonstrate that she was prejudiced by Filip's performance.[10]

---

[9] The dissent accuses us of misunderstanding defendant's burden under the prejudice prong of *Strickland*. Yet, ironically, it is the dissent, not us, that applies the wrong standard. The dissent states: "Because defendant has shown that her trial counsel's performance deprived her of a substantial defense, she has met her burden of showing prejudice, unless other evidence rendered this defense unbelievable." *Post* at 9. The dissent fails to recognize that to demonstrate prejudice, a defendant "must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Carbin, supra* at 600. Instead, the dissent erroneously suggests that prejudice is presumed if defendant was deprived of one of several theories of defense. Contrary to the dissent's assertion, that a defense attorney performed deficiently in presenting a viable defense does not *automatically* require the conclusion that there is a reasonable probability that the result of the proceeding would have been different absent counsel's deficient performance. The dissent does not explain why there is a reasonable probability that she would have been acquitted had defense counsel presented expert testimony to support the theory that Burley died of a morphine or multiple-drug overdose. Justice Kelly also mentions repeatedly that she thinks that defendant might be innocent. But the guilt or innocence of the accused is a matter to be decided by the fact-finder, not the appellate courts. Defendant is not entitled to relief unless she satisfies *Strickland*'s test for prejudice.

[10] The dissent argues that Filip's performance was deficient because he failed to present an expert to challenge the prosecution's theory regarding the cause of death. The dissent's argument is misplaced. The majority does not conclude that defendant failed to show that counsel's performance was deficient.

(continued…)

11

## A.  THE EXPERT TESTIMONY

Dr. Pacris testified at trial that he performed an autopsy on Burley on April 3, 2002.  Dr. Pacris initially concluded that Burley had died from natural causes.  But because a police officer told Dr. Pacris that he suspected that Burley might have been injected with insulin, which can be fatal to a nondiabetic, Dr. Pacris sent Burley's fluids to AIT Laboratories to be tested for insulin, glucose, and C-peptide levels.  The tests revealed that Burley's glucose level was zero and that his insulin and C-peptide levels were normal.  Dr. Pacris explained that, although the glucose levels in a person's bodily fluids drop immediately after the person dies, the complete lack of glucose in Burley's vitreous fluids was consistent with a finding that Burley had been injected with insulin.[11]  He found acute tubular necrosis in the kidneys and dead cells in the proximal tubules of the brain, which are usually seen in people who have suffered hypoglycemic shock.  Dr. Pacris ultimately concluded that the cause of death was complications from

_____

(…continued)
Rather, the majority concludes only that defendant was not denied the effective assistance of counsel, because she failed to show that she was prejudiced by counsel's performance.  This aspect of the dissent's argument appears directed at the concurrence, not the majority opinion.

[11] An insulin injection causes a nondiabetic's glucose level to drop to a dangerous level, depriving the brain of necessary glucose.  The person's brain will then shut down, and the person will become comatose.

hypoglycemia, which can be caused by an insulin injection.[12]  In reaching this conclusion, he relied more on his anatomical findings and the circumstances surrounding the death rather than on the toxicological findings.  Specifically, he relied on microscopic hypoxic[13] changes in Burley's brain in concluding that Burley must have been comatose for at least 12 hours before he died at 4:00 p.m. on April 2, 2002.  He testified that hypoxic changes to the brain, including red neurons on the hippocampus, are only manifested if the person has been comatose for about 12 hours.  Because this conclusion was inconsistent with defendant's story that Burley had been alive and conscious at noon on that day, Dr. Pacris concluded that defendant's story "doesn't jive."

Dr. Evans also testified at trial for the prosecution.  He testified that if glucose had been present in Burley's system, it would have disproved death by insulin injection.  The lack of any glucose in Burley's vitreous fluids supported the theory that Burley had been injected with insulin.  Further, although the level of morphine in Burley's blood was very high, it might not be lethal to someone who had built up a tolerance for it.

---

[12] Although Dr. Pacris did not find a needle mark on Burley's body, he explained that insulin is injected by means of a hypodermic needle, which normally does not leave a visible mark on the body.

[13] "Hypoxic" is defined as "[d]enoting or characterized by hypoxia." *Stedman's Medical Dictionary* (26th ed).  "Hypoxia" refers to a "[d]ecrease below normal levels of oxygen in inspired gases, arterial blood, or tissue . . . ." *Id*.

At the *Ginther* hearing, Dr. Simson disagreed with the conclusions of Dr. Pacris and Dr. Evans. He testified that Burley's vitreous and blood glucose levels had been confused in the reports and in the testimony introduced at trial. Dr. Simson opined that the pathological and toxicological findings did not support the view that Burley had died of hypoglycemic shock caused by an insulin overdose. He opined that because a person's vitreous glucose level can drop to zero after he dies, the lack of glucose in Burley's vitreous fluids did not prove that he died of hypoglycemic shock. Dr. Simson further opined that the necrosis of the proximal tubules in Burley's brain and the acute tubular necrosis in the kidneys could be attributed to postmortem changes rather than hypoglycemic shock. That is, Dr. Simson responded to Dr. Pacris by arguing that the anatomical changes observed in Burley's body may have been attributable to decomposition, rather than an insulin overdose. Dr. Simson also testified that the normal reddish-brown color of the kidneys was inconsistent with kidneys that had undergone hypoglycemic shock. Dr. Simson opined that he would have concluded that Burley had died of a multiple-drug overdose, primarily caused by a high level of morphine. He explained that Burley's morphine level at the autopsy was approximately three times the therapeutic limit, meaning that his morphine level would have been even higher if, as Dr. Pacris testified, Burley had been comatose for 12 hours before his death. Dr. Simson conceded,

14

however, that he had seen cases of much higher levels of morphine in the blood.[14]

Dr. Simson also acknowledged that the evidence was "not inconsistent with hypoglycemic shock" and that he could not rule out the possibility that insulin overdose was the cause of death.

Dr. Pacris defended his trial testimony that Burley had died of hypoglycemic shock caused by insulin. In response to Dr. Simson's *Ginther* hearing testimony, Dr. Pacris first testified that, in reaching the conclusion that Burley died from an insulin injection, he had principally relied on the changes observed in the brain and kidneys, rather than Burley's low glucose level. Dr. Pacris then testified that the necrosis of the proximal tubules in Burley's brain and the acute tubular necrosis in the kidneys could not be attributed to postmortem changes because there was no evidence that the body was decomposing.[15] Dr. Pacris noted that the necrosis in Burley's brain had occurred solely in the third and fourth layers of the cortex and that the remainder of the cortex had not yet decomposed. This difference indicated that the changes in the third and fourth layers of the cortex were not caused by general decomposition,

---

[14] The therapeutic level for morphine is 30 to 100 nanograms per milliliter of blood. The laboratory report stated that Burley had a morphine level of 328 nanograms per milliliter. Dr. Simson testified that he had seen cases as high as 800 to 900 nanograms of morphine per milliliter. The laboratory report listed the lethal level of morphine at 200 to 2,300 nanograms per milliliter, indicating that there have been cases of morphine levels up to 2,300 nanograms per milliliter.

[15] Dr. Pacris referred to the decomposition of the body tissues as "autolysis."

as suggested by Dr. Simson, because some necrosis would have been found in the remainder of the cortex if the changes observed were due to general decomposition. Moreover, Dr. Pacris noted that there are microscopic differences between cells that are simply decomposing and cells that have been altered before death by changes due to lack of glucose in the body. According to Dr. Pacris, the microscopic changes observed in Burley's kidneys reflected a lack of glucose in the blood before death, rather than general decay after death. In short, Dr. Pacris responded to Dr. Simson by arguing that the specific changes observed in Burley's body were incompatible with Dr. Simson's theory that the changes were caused simply by decomposition. Moreover, Dr. Pacris explained that the normal reddish-brown color of the kidneys, which Dr. Simson had found important, was not inconsistent with Dr, Pacris's microscopic finding that the kidneys had acute tubular necrosis caused by hypoglycemic shock. Furthermore, Dr. Pacris testified that although Burley had a high level of morphine in his system, he could not have died from a morphine overdose. He explained that death from a morphine overdose is instantaneous. The person does not initially become comatose. A morphine overdose was inconsistent with the hypoxic changes in Burley's brain that indicated he had been comatose for 12 hours before death. Although Burley's morphine level was three times the therapeutic limit, this amount of morphine might not be fatal to a person who had developed a tolerance to the drug, as Burley had.

After hearing the testimony of Dr. Simson and Dr. Pacris, the trial court concluded that Dr. Simson's testimony would not have changed the outcome of the trial. By declining to conclude that Dr. Simson's testimony had effectively refuted the testimony of Dr. Pacris, the trial court implicitly held that Dr. Simson was not more credible than the prosecution's experts. "[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). We review a trial court's determination of credibility for clear error. *People v Knight*, 473 Mich 324, 344; 701 NW2d 715 (2005). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *Bynum v EASB Group, Inc*, 467 Mich 280, 285; 651 NW2d 383 (2002).

The Court of Appeals stated that Dr. Simson's testimony would have "refuted [Dr. Pacris's] conclusions that Burley died as a result of an insulin overdose . . . ." *Dendel*, *supra* at 4. Hence, the Court of Appeals implicitly concluded that the trial court had committed clear error by failing to find Dr. Simson more credible than Dr. Pacris and Dr. Evans. However, unlike the Court of Appeals panel, we see no reason to disturb the trial court's implicit finding on the credibility of the expert witnesses; the testimony does not clearly demonstrate that one expert witness was more credible than another. Although Dr. Simson opined that the pathological and toxicological findings did not support the view that Burley had died of hypoglycemic shock, Dr. Pacris defended his position at

17

the *Ginther* hearing by offering legitimate reasons for his findings and for discounting Dr. Simson's theory that the relevant changes in Burley's body were due simply to general decomposition. Dr. Simson did not respond to Dr. Pacris's rebuttal of his testimony. It is also significant that Dr. Simson conceded the possibility that Burley had died from insulin overdose. Thus, Dr. Simson did not conclusively refute Dr. Pacris's testimony that Burley had died of an insulin overdose. We are not "left with the definite and firm conviction" that the trial court erred in finding that Dr. Simson was not more credible than Dr. Pacris and Dr. Evans.

Further, defendant's own statements supported the theory of the prosecution's experts regarding the cause of Burley's death. After defendant's arrest, she told both police detectives and defense counsel that Burley had injected himself with insulin. These statements were inconsistent with Dr. Simson's theory of death, but were consistent with the testimony of the prosecution's experts that Burley had died of an insulin overdose.[16]

For all these reasons, we have no cause to believe that if Dr. Simson had testified at trial, the trial court would have given more weight to his testimony

---

[16] The dissent argues that the defense theory that Burley killed himself by an insulin injection is "a highly unlikely occurrence given his debilitated physical condition . . . ." *Post* at 7. Although this may or may not be true, defendant herself, who presumably knew Burley's physical capabilities better than anyone else, told the police detectives that Burley was physically able to inject himself with insulin and had in her opinion done so. Thus, it was reasonable for defense counsel to argue that Burley had injected himself with insulin.

than that of the prosecution's experts. We conclude that defendant did not establish a "reasonable *probability*" that the outcome of the trial would have been different had Dr. Simson testified. *Strickland, supra* at 694 (emphasis added).[17]

### B. OTHER CIRCUMSTANTIAL EVIDENCE

We also conclude that the trial court did not err when it held at the *Ginther* hearing that, even if Filip had called an expert to rebut the testimony of Dr. Pacris and Dr. Evans, "there was a lot of other evidence" supporting defendant's conviction and that the outcome of the trial would have been the same. Even if Dr. Simson had testified, the strong circumstantial evidence supported the theory that defendant had given Burley an insulin injection.

Burley was difficult to care for because of his multiple health problems, which included dementia. Defendant was under a great deal of stress as Burley's sole caregiver.[18] Frustrated by Burley's demands, defendant had considered

---

[17] As discussed, the trial court, which was the finder of fact at the bench trial, stated at the *Ginther* hearing that the outcome of the trial would *not* have changed if Dr. Simson had testified. Because we review de novo the trial court's determination of prejudice, however, the fact-finder's determination on that issue at the *Ginther* hearing is not binding on the appellate courts. We underscore that the test for prejudice is an objective test and that appellate courts should not simply defer to the trial court's judgment regarding prejudice, even if the trial court was the fact-finder at the original trial, as in this case.

[18] The dissent supports its assertion that defendant does not have "the behavioral profile of a cold-blooded killer," *post* at 10, by stating that defendant financially supported Burley while he was ill. The dissent mischaracterizes the couple's financial situation. In fact, defendant received $730 monthly from the FIA to care for Burley and Burley's social security disability benefits of $530 monthly. As Burley's caregiver, she was entitled to live in government-subsidized
(continued…)

giving him a shot of insulin, which she knew could be lethal and would be difficult to detect in a deceased person. When her caregiving situation became worse, defendant unsuccessfully attempted to obtain assistance in caring for Burley from several sources. Less than 24 hours before Burley's death, defendant became "quite tearful and upset" when the nurse assisting defendant terminated her services because Burley had been uncooperative. Defendant admitted that she was at her "wit's end" in the middle of that night when the police declined to take Burley away after he caused a disturbance. In light of the facts leading up to Burley's death, the trier of fact could reasonably conclude that this nighttime incident caused defendant to finally snap and follow through with her idea to inject Burley with insulin. This finding would be consistent with Dr. Pacris's testimony that hypoxic changes in Burley's brain indicated that he had fallen into a coma from insulin-induced hypoglycemic shock at about 4:00 a.m., shortly after the police left.

---

(…continued)

housing. Although Burley's family and the FIA urged defendant to place Burley into a nursing home, hospice care, or some other program that would furnish Burley with better medical care, defendant declined to do so, explaining to Burley's sister that if she were to put Burley into a nursing home, she would lose her housing, the FIA benefits, and Burley's income. On the other hand, if Burley were to die, defendant would gain some financial security: defendant was the sole beneficiary of six life insurance policies that she had taken out on Burley, worth approximately $25,000 at the time of Burley's death. Thus, the evidence suggests that defendant may have had financial motivations for rendering care to Burley.

The trier of fact could also infer that defendant's actions after Burley's death demonstrated her guilty state of mind and her attempt to cover up the crime. Defendant testified that when she suspected that Burley might be dead, she did not contact 911, but instead called a friend to come over. Defendant lied to Burley's family about his condition and hid his death from the only persons who might have questioned the cause of death and recalled her threat to inject him with insulin.[19] Moreover, defendant managed to have Burley's body cremated before Burley's family could question the cause of death. She had also wanted Burley's body cremated without an autopsy being performed,[20] but was unable to prevent the autopsy. This circumstantial evidence regarding defendant's state of mind further supports the prosecution's theory that defendant murdered Burley.

Considering all this strong circumstantial evidence of defendant's guilt, we hold that the trial court did not err in concluding that defendant would have

---

[19] The dissent suggests that defendant did not tell Burley's family about his death because she, not Burley's family members, had cared for Burley toward the end of his life. Although we cannot know with certainty defendant's motives, defendant's failure to inform Burley's family of his death was sufficiently unusual to support an inference that defendant acted with a guilty state of mind.

[20] We do not disagree with the dissent's assertion that a decision to cremate a loved one, by itself, is not unusual. But the decision to have a loved one cremated *before the victim's family knows about the death and before an autopsy can be performed* supports an inference of a guilty state of mind.

been convicted of second-degree murder even if Dr. Simson had challenged the conclusions of the expert witnesses for the prosecution.[21]

## IV. CONCLUSION

Defense counsel was not ineffective for failing to produce an expert at trial who would rebut the testimony of the prosecution's experts that Burley died from an insulin overdose. Defendant was not prejudiced by Filip's failure to produce an expert witness because there is no indication that the trial court would have accepted the testimony of defendant's expert over that of the prosecution's experts and there was other strong circumstantial evidence to support defendant's guilt. Therefore, we reverse the judgment of the Court of Appeals and reinstate the trial court's verdict.

Maura D. Corrigan
Clifford W. Taylor
Elizabeth A. Weaver
Robert P. Young, Jr.
Stephen J. Markman

---

[21] The dissent states:

> [H]ad defense counsel challenged the cause of death, the finder of fact would have been left with two reasonable alternatives: (1) to decide that the evidence showed that defendant killed Burley or (2) to conclude that Burley killed himself, intentionally or accidentally, possibly to spare his loving companion of nearly 30 years the burden of his continuing care. [*Post* at 11.]

Yet Filip's decision not to present an expert witness challenging the conclusions of the prosecution's expert witnesses regarding the cause of death left the fact-finder with *the same* reasonable alternatives. The only difference is that Filip chose to argue that Burley killed himself with insulin, not morphine or some other drug. This was a viable defense that Filip energetically pursued.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

No. 132042

KATHERINE SUE DENDEL,

      Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, J. (*concurring*).

I concur with the majority's conclusion that defendant was not denied the effective assistance of counsel because she failed to show that she was prejudiced by counsel's performance. I write separately because, in my opinion, defendant also failed to satisfy the other requirement of an ineffective-assistance claim: to show that counsel's performance was constitutionally deficient. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Defense counsel Joseph Filip reasonably decided to advance the theory that the victim, Paul Michael Burley, died from injecting himself with insulin. Filip's decision to pursue a suicide defense was not deficient because it logically flowed from defendant's statements to the detectives and to counsel. In light of this defense, defense counsel did not need to challenge the testimony of the prosecution's experts that Burley died of hypoglycemic shock caused by insulin.

"'[T]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.'" *Johnston v Singletary*, 162 F3d 630, 642 (CA 11, 1998) (citation omitted). A defense counsel's decision regarding trial strategy is not demonstrably deficient if the defendant directed that strategy. *Keith v Mitchell*, 455 F3d 662, 672 (CA 6, 2006). "[The Sixth Amendment] speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta v California*, 422 US 806, 820; 95 S Ct 2525; 45 L Ed 2d 562 (1975). In *United States v Wellington*, 417 F3d 284, 289 (CA 2, 2005), the Court of Appeals for the Second Circuit explained that the lawyer's role is to advocate for his client and follow his client's wishes if possible:

> It is the "role of the lawyer [to be] a professional advisor and advocate," *Lefcourt v. United States*, 125 F.3d 79, 86 (2d Cir.1997) (quoting *In re Shargel*, 742 F.2d 61, 62-63 (2d Cir.1984)), not to usurp his "'client's decisions concerning the objectives of representation,'" *see Jones v. Barnes*, 463 U.S. 745, 753 n. 6, 103 S.Ct. 3308, 77 L Ed.2d 987 (1983) (recognizing that, where ethically and legally possible, "'[a] lawyer shall abide by a client's decisions concerning the objectives of representation'") (quoting ABA Model Rules of Prof'l Conduct R. 1.2(a)); *Wallace* [*v Davis*, 362 F3d 914, 920 (CA 7, 2004)] ("By respecting [his client's] wishes, counsel not only abided by ethical requirements (lawyers are *agents*, after all) but also furnished the quality of assistance that the Constitution demands.") (emphasis in original); *cf. Faretta v. California*, 422 U.S. 806, 820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally.").

In *Wellington,* the Second Circuit rejected the defendant's argument that his trial counsel was ineffective because, as a result of counsel's following the defendant's instructions, counsel pursued a strategy that, in the absence of the defendant's instructions, might have constituted professional error. The Court explained:

> [T]o the extent that defendant instructed his counsel to pursue a course of action that defendant now complains of, there was no abridgement—constructive or otherwise—of defendant's Sixth Amendment right to effective assistance of counsel. *See Roe v. Flores-Ortega*, 528 U.S. 470, 477, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) ("[A] defendant who explicitly tells his attorney *not* to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently.") (citations omitted) (emphasis in the original); *see also Coleman v. Mitchell*, 268 F.3d 417, 448 n. 16 (6th Cir.2001) ("[C]ounsel was not ineffective for following the defendant's clear and informed instruction.")[1]; *Frye v. Lee*, 235 F.3d 897, 906-07 (4th Cir. 2000) (observing that if the Court were to hold that defense counsel "rendered ineffective assistance [by acceding to the defendant's instructions not to present] . . . mitigation evidence, [the Court] would be forcing defense lawyers in future cases to choose between Scylla and Charybdis"); *Autry v. McKaskle*, 727 F.2d 358, 360-61 (5th Cir. 1984) (rejecting claim of ineffective assistance of counsel for failure to investigate and present evidence at sentencing phase where

---

[1] In *Coleman v Mitchell*, 268 F3d 417, 448 (CA 6, 2001), the Court of Appeals for the Sixth Circuit held:

> If the record indicated a clear, informed assertion by Petitioner that he did not wish his counsel to present any mitigation evidence in Petitioner's behalf, case law may have supported the district court's conclusion that counsel, merely respecting the informed wishes of a client, *need not have investigated or presented any evidence* in connection with Petitioner's background at the penalty phase of the trial. [Emphasis added.]

3

defendant had instructed his attorney not to fight the death penalty) . . . . [*Wellington, supra* at 289.]

By arguing that Burley had injected himself with insulin, Filip reasonably pursued a theory of defense that was consistent with defendant's wishes and her previous statements to the police regarding Burley's death. Specifically, defendant told the police detectives that Burley had injected himself with insulin. She also stated at a later interview: "That poor dear, he killed himself for me." Defendant, the person who knew Burley's physical capabilities the best, told a detective that despite Burley's severely impaired vision and problems with holding things, he could inject himself with insulin. Before trial, defendant told Filip that Burley had killed himself by an insulin injection and that she wanted him to pursue this defense theory at trial. Defendant also testified that Burley had mental problems and that he had "talked suicide for 10, 15 years." She testified that she had informed two of Burley's doctors of his suicidal intentions. In light of defendant's statements and wishes, it was reasonable for Filip to argue at trial that Burley had died by a self-administered insulin injection, rather than by a morphine overdose. This is especially so when Filip knew that the prosecution had two well-qualified expert witnesses, Dr. Bernardino Pacris and Dr. Michael Evans, whose anticipated testimony supported the theory that Burley died from an insulin overdose. As Filip testified at the *Ginther*[2] hearing, his primary theory

---

[2] *People v Ginther,* 390 Mich 436; 212 NW2d 922 (1973).

of defense, that Burley took his own life by taking insulin, did not require him to dispute the opinions of the prosecution's experts. Thus, Filip's decision not to present an expert was reasonable in light of his theory of defense.

Second, even though defendant wanted Filip to pursue a defense theory that avoided challenging the conclusions of the prosecution's experts, Filip nonetheless had consulted two doctors regarding the cause of Burley's death. He first talked to a local general practitioner, who referred him to an endocrinologist,[3] Dr. Halsey.[4] Dr. Halsey's views did not refute Dr. Pacris's opinion that Burley died from an insulin overdose. Because consultation with two doctors revealed nothing that would cause Filip to question the conclusions of the prosecution's experts, he reasonably ended the investigation at that point. He had no reason to believe that further investigation would lead to the discovery of an expert who might question Burley's cause of death.

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. [*Strickland, supra* at 690-691.]

---

[3] Endocrinology is the study of the glands and hormones of the body and their related disorders. Thus, an endocrinologist would be familiar with insulin shock as a cause of death.

[4] Dr. Halsey's first name is not mentioned in the transcript of the *Ginther* hearing.

5

Defendant, in appellate hindsight, essentially faults Filip for failing to find the "right" expert. A defense attorney is not required to repeatedly consult experts until he finds one who will support a certain theory. "Although attorneys can always do more in preparation for a trial," the failure to do so does not mean that they are ineffective. *Mason v Mitchell*, 320 F3d 604, 618 (CA 6, 2003).

"Judicial scrutiny of counsel's performance must be *highly deferential*" and should refrain from second-guessing counsel's chosen trial strategy. *Strickland*, *supra* at 689 (emphasis added). "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct*." *Id.* at 690 (emphasis added). "A reviewing court must not evaluate counsel's decisions with the benefit of hindsight." *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004), citing *Strickland, supra* at 689. Defense counsel's strategic choices were constrained by defendant's actions. Defendant has failed to show that, given what Filip knew at the time, Filip's decision not to challenge the testimony of the prosecution's experts that Burley had died from an insulin overdose was not a matter of sound trial strategy. See *People v Mitchell*, 454 Mich 145, 156; 560 NW2d 600 (1997), quoting *Strickland, supra* at 689 (stating that a defendant must "'overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy"'"). Because Filip's representation was adequate at the time and under the circumstances known to him, it was sufficient to pass constitutional muster.

In sum, I conclude in the majority opinion that defense counsel was not ineffective because his performance did not prejudice defendant, and four other justices support that conclusion. I separately conclude that counsel was not ineffective because his performance was not constitutionally deficient for failing to produce an expert to refute the prosecution's experts. Filip had no reason to challenge the testimony of the prosecution's experts, given defendant's theory of defense and her own prior statements to the police regarding the cause of death. Moreover, Filip sufficiently investigated other theories.

Accordingly, I conclude that defendant has not established a Sixth Amendment ineffective-assistance claim.


Maura D. Corrigan

7

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                            No. 132042

KATHERINE SUE DENDEL,

      Defendant-Appellee.

_____

KELLY, J. (*dissenting*).

The majority reverses the Court of Appeals decision and reinstates defendant's conviction after concluding that defendant failed to demonstrate that her trial counsel's performance prejudiced her. Because there is a reasonable possibility that defendant is innocent and her counsel's performance deprived her of her only viable defense, I believe she is entitled to a new trial. Accordingly, I dissent from the majority's reinstatement of the guilty verdict.

## THE FACTS

This case involves the death of a gravely ill man. At the time of his death, Paul Burley had been involved in a relationship with defendant, Katherine Dendel, since 1975. Burley had suffered from many illnesses including hepatitis B, hepatitis C, herpes, chronic obstructive pulmonary disease, throat cancer, an infection with human immunodeficiency virus (HIV), neuropathy, and epilepsy.

Due to his poor health, Burley was frequently hospitalized and required constant care while at home, care that defendant provided.

The day of Burley's death began with a phone call to the police. At approximately 3:00 a.m., defendant called to report that Burley was running back and forth in the house with a knife. But by the time the police arrived, all was calm. Defendant told the police that she was not concerned that Burley would injure her, but was concerned that, given his impaired mental state, he might injure himself. Concluding that Burley was not a threat to himself or to anyone else at that time, the police took no action.

Later in the morning, defendant left the house to perform errands. She also made inquiries about placing Burley in a nursing home. She had made numerous similar inquiries before. Defendant returned home, fed Burley his lunch, and performed other errands, including inquiring further about placing Burley in a nursing home. At approximately 5:00 p.m., she checked on Burley and found him in a comatose state. She telephoned Aida Winters, her friend, for assistance and moments later, having ascertained that Burley was dead, summoned the police. Defendant was hysterical and continued in that state while the police and ambulance workers took away Burley's body.

Initially, the Oakland County medical examiner, Dr. Bernardino Pacris, concluded that Burley died of natural causes. However, after he spoke with the police officers who were investigating the death, Dr. Pacris revisited his findings. He then concluded that the cause of death was an insulin injection, although he

2

found no needle mark.  Burley did not have a prescription for insulin.  It should be noted, however, that defendant was a diabetic.  The process by which Dr. Pacris determined the cause of death was founded on an anatomical basis and the circumstances surrounding the death rather than on toxicological findings.

Defendant was charged with first-degree murder.  At trial, Dr. Pacris and Dr. Michael Evans[1] testified for the prosecution.  Both Drs. Pacris and Evans concluded that the evidence supported a theory that Burley died of an insulin overdose.  In closing argument, the prosecutor argued that, given Burley's numerous physical ailments, he was unable to prepare insulin for administration and inject himself with it.  The prosecution also attempted to show that the circumstances surrounding the death gave rise to a suspicion of murder.

Defense counsel argued, on the other hand, that Burley either took his own life or died from natural causes.  However, counsel did not present evidence to counter the prosecution's medical experts, who concluded that Burley died of an insulin overdose.  This was despite the fact that counsel had successfully petitioned for the appointment of an expert for the defense.

Ultimately, the court convicted defendant of second-degree murder.  Relying on the prosecution's medical testimony, the court found that Burley died of an insulin overdose.  The court credited the prosecution's argument and found it

---

[1] Dr. Evans was a professor of toxicology and is the president and chief executive officer of AIT Laboratories.

not believable that the gravely ill Burley was physically capable of injecting himself with a lethal dose of insulin.

Defendant appealed her conviction in the Court of Appeals. On its own motion, the Court appointed new counsel for her and remanded the case for a *Ginther*[2] hearing to determine whether defendant had received effective assistance of counsel at trial. Among the witnesses at the hearing were defendant's former counsel and a forensic pathologist, Dr. Laurence Simson,[3] who was an expert witness brought in by defendant's newly appointed appellant counsel.

Defendant's former counsel testified that he (1) never consulted an independent forensic pathologist, (2) never had the body tested for the presence of insulin, (3) spoke only briefly with his own general practitioner regarding the cause of death and was referred to an endocrinologist, Dr. Halsey, (4) spoke with Dr. Halsey but took no notes of the conversation, (5) did no research into Dr. Halsey's expertise, (6) did not give either the general practitioner or the endocrinologist Burley's medical records to review, and (7) did not speak to the physician who treated Burley during his last hospitalization.

The forensic pathologist, Dr. Simson, testified that there was a lack of significant evidence that Burley died of an insulin overdose. Instead, he

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] Dr. Simson is a forensic pathology consultant, a former professor of pathology, an Ingham County pathologist, and a national consultant in forensic pathology to the Surgeon General of the United States Air Force.

concluded that Burley died of a multiple-drug overdose. He based his conclusion on the fact that Burley had a lethal level of morphine in his system along with therapeutic levels of several other drugs.

At the *Ginther* hearing, Dr. Pacris was questioned about his trial testimony that Burley died of an insulin overdose. He was asked if he had considered that a lethal dose of morphine was found in Burley's body. He testified that he had based his conclusion that Burley did not die of a morphine overdose on his assumption that Burley had developed a tolerance to the drug. But he admitted that he had not checked to learn how much morphine Burley had been using.

At the conclusion of the hearing, Judge Chad C. Schmucker, who also presided at the bench trial, found that defense counsel had not provided ineffective assistance. He found that counsel's brief consultations with Drs. Burgess and Halsey were all that was required of him. He also concluded that, even if counsel's performance had been deficient, defendant could not show prejudice.

In a split, unpublished decision, the Court of Appeals reversed defendant's conviction.[4] The majority determined that, in light of the pivotal nature of the medical evidence, it was unreasonable for defense counsel to have consulted only briefly with the two doctors. It was unreasonable for him not to have furnished the physicians with documentation regarding Burley's medical history or the

_____

[4] *People v Dendel,* unpublished opinion per curiam, issued July 18, 2006 (Docket No. 247391).

5

circumstances surrounding his death. And because defense counsel's deficient performance deprived defendant of a substantial defense, the majority held that there was a reasonable probability that it adversely affected the outcome of the trial.

The dissenting judge emphasized the prejudice prong of the test for ineffective assistance of counsel. He found no reason to conclude that the trial judge had clearly erred in concluding that defendant could not show prejudice.

The prosecution applied for leave to appeal in this Court. We heard oral argument on the application on October 3, 2007.[5]

THE SUFFICIENCY OF DEFENSE COUNSEL'S LEGAL REPRESENTATION

The standard for ineffective assistance of counsel is the same under both the Michigan and federal constitutions.[6] A defendant must show that defense counsel's performance was objectively unreasonable and that this performance prejudiced the defense.[7] In this case, the majority reinstates defendant's conviction after deciding that defendant cannot show prejudice.

To demonstrate prejudice, one must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

---

[5] 477 Mich 1012 (2007).

[6] *People v Pickens*, 446 Mich 298, 326; 521 NW2d 797 (1994).

[7] *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

6

been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[8]

Here, the prosecution's case hinged on the cause of death. The prosecution contended that defendant died of an insulin overdose, and it presented evidence to support this theory. The prosecutor argued that defendant was physically incapable of injecting himself with insulin. By failing to counter this theory, defense counsel left the finder of fact with two choices: It could find (1) that Burley killed himself by insulin overdose, a highly unlikely occurrence given his debilitated physical condition, or (2) that defendant killed Burley by administering a fatal dose of insulin. Thus, by failing to counter the prosecution's theory of the cause of death, defense counsel left defendant with no viable defense.

By contrast, defense counsel could have challenged the prosecution's theory of the cause of death, providing the trier of fact with a meaningful choice. Evidence could have been presented that Burley died from a different cause, such as a multiple-drug overdose, as Dr. Simson concluded. This would have been particularly effective in light of the fact that Dr. Pacris did not immediately identify the cause of death as an insulin overdose. Dr. Pacris considered the possibility of an insulin overdose only after the police informed him that they suspected Burley might have died from an insulin injection. Furthermore, Dr. Pacris did not check into Burley's use of morphine, despite the fact that Burley

---

[8] *Id.* at 694.

died with a large amount of morphine in his system. Importantly, unlike insulin, which is injected, morphine is available in pill form, and there was evidence that Burley had access to morphine pills.

Burley could have self-administered a fatal dose of morphine, either accidentally or intentionally.[9] Thus, had defense counsel challenged the cause of death, the finder of fact could have concluded that Burley died of a noncriminal act. Defendant's appellate counsel demonstrated that trial counsel easily could have found an expert witness to refute the prosecution's theory regarding the cause of death. It follows that the trial attorney's failure to adequately investigate and pursue the viable theory that Burley died of a noncriminal act deprived defendant of a substantial defense.[10]

---

[9] At oral argument, I specifically inquired whether it is easier to self-administer morphine than it is to self-administer insulin. My concern was this: If it is unreasonable to conclude that defendant self-administered a fatal dose of insulin, why would it be reasonable to conclude that he self-administered a fatal dose of morphine? The answer that defendant's counsel gave was that it is much easier to administer morphine because, unlike insulin, Burley's "morphine was pills, and there was testimony that [Burley] had a large number of pills available to him and that he had access to those pills." It is this difference that makes a self-administered overdose of morphine believable but a self-administered overdose of insulin by a man in Burley's condition unbelievable.

[10] The majority criticizes me for explaining how trial counsel's performance was deficient. It claims that this portion of my argument is "misplaced." *Ante* at 11 n 10. I disagree. In this case, the two prongs of the test for ineffective assistance of counsel are inextricably linked. I cannot explain how defendant was prejudiced without explaining how defense counsel's performance was deficient.

Because defendant has shown that her trial counsel's performance deprived her of a substantial defense, she has met her burden of showing prejudice, unless other evidence rendered this defense unbelievable.[11] The record reveals that, had defendant presented Dr. Simson's testimony at trial, the evidence would have supported either of two competing theories of the cause of death. As the majority points out, there was circumstantial evidence that tended to show a guilty mind. The majority discusses only this evidence. But it ignores the evidence that tends to show that Burley died of a noncriminal act.

This evidence is that defendant and Burley had a relationship that had lasted nearly 30 years. During this period, Burley suffered from many illnesses, including an HIV infection. As Burley battled these ailments, defendant stood by his side, providing him with needed care. Defendant was not only Burley's companion and caregiver during this period, she was his financial support. He had

---

[11] The majority claims that I apply the wrong standard by presuming prejudice. I do no such thing. In order to meet her burden of showing prejudice, defendant had to show that defense counsel's deficient performance undermined confidence in the outcome. Accordingly, if defendant shows that counsel's performance deprived her of a viable defense, she has shown prejudice. This is because a viable defense equates to a reasonable chance at acquittal. Thus, I do not presume prejudice. Rather, I consider whether her counsel's performance deprived defendant of a viable defense. If so, a new trial is required because there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 US at 694. On the other hand, if the defense defendant was deprived of was unbelievable, she would not be entitled to a new trial because she could not show prejudice.

not been gainfully employed since the mid-1980s.[12]  Hers is hardly the behavioral profile of a cold-blooded killer.

The evidence also tended to show that Burley's mental health had deteriorated and that he was possibly abusing morphine and other drugs.  In fact, defendant had to call the police on the day Burley died because he was brandishing a knife, arousing her concern that he might hurt himself.  And there was evidence that defendant had hidden drugs from Burley to prevent him from overdosing himself.  Also, she had contacted numerous sources in the period before Burley's death in an attempt to get him the 24-hour, 7 day-a-week care he required.

There are also innocent explanations for the acts to which the majority attributes sinister motives.  Because defendant, not Burley's family members, tended Burley toward the end of his life, it is not surprising that defendant was not eager to inform his family of his death.  This is especially likely in light of the fact that, as defendant testified, she felt the family had turned its back on Burley.[13]

_____

[12] The majority suggests that I ignore evidence that defendant may have had an improper motive in caring for Burley.  That is not true.  I recognize that the circumstantial evidence pointed in different directions.  I focus on the evidence that tended to show that Burley died of a noncriminal act because the majority fails to address this evidence at all.  This is error because, when considering whether defendant was prejudiced, it is necessary to consider the totality of the circumstances surrounding Burley's death.

[13] There was evidence that Burley's family intentionally avoided him after he contracted an HIV infection.  For example, he was no longer invited to family gatherings, such as Easter celebrations and Super Bowl parties.

Nor does the fact that defendant was exasperated with providing Burley constant care render her a murderer. And defendant's decision to call a friend before summoning the police after discovering Burley in a comatose state is understandable. Defendant could have been overwhelmed by shock and sadness at discovering her longtime companion near death. It is even more reasonable to attribute an innocent explanation to this behavior when one considers that defendant had prearranged for the friend to assist her if Burley died. Nor was defendant's decision to cremate Burley unusual, since cremation is a common alternative to burial in this country, especially for those who have suffered from debilitating ailments. Finally, the fact that defendant understood insulin's effect on the body is not surprising in light of the fact that she is a diabetic.

The nonmedical evidence surrounding the death could support a finding that Burley died of a noncriminal act. Accordingly, had defense counsel challenged the cause of death, the finder of fact would have been left with two reasonable alternatives: (1) to decide that the evidence showed that defendant killed Burley or (2) to conclude that Burley killed himself, intentionally or accidentally, possibly to spare his loving companion of nearly 30 years the burden of his continuing care. The strategy employed by defense counsel left defendant with no viable defense, whereas another strategy could have resulted in an acquittal. Hence, confidence in the outcome has been undermined sufficiently to require a new trial. Accordingly, I would affirm the Court of Appeals decision.

11

The majority disagrees with me and reinstates defendant's conviction. In so doing, the majority opinion seems to misapprehend defendant's burden. It would seem to require defendant to prove that she is actually innocent of the crime in order to be entitled to relief. Even though defendant might be innocent, this is not the standard. The standard is "a probability sufficient to undermine confidence in the outcome."[14] Because defense counsel's performance deprived defendant of a viable, reasonable, and believable defense, the standard was met in this case.

CONCLUSION

The Court of Appeals decision to vacate defendant's conviction did not hang on what some people term "a legal technicality." Instead, there is a very real possibility that defendant is innocent of the crime of which she has been convicted. Yet her counsel never gave the finder of fact a realistic option of returning a verdict of not guilty. By effectively conceding the cause of death, counsel deprived defendant of her only viable defense. The Court of Appeals correctly reversed defendant's conviction and remanded the case for a new trial. I would affirm its judgment.

Marilyn Kelly
Michael F. Cavanagh

---

[14] *Strickland*, 466 US at 694.